**BLANKEN & BLANKEN INVEST-MENTS, INC., Appellant,**

v.

**KEG, INC., T/A "The Keg", Appellee.**

**No. 11977.**

District of Columbia Court of Appeals.

Argued Sept. 29, 1977.

Decided March 1, 1978.

Steven M. Pavsner, Washington, D. C., for appellant.

J. E. Wingfield, Washington, D. C., for appellee.

Before KERN, HARRIS and FERREN, Associate Judges.

HARRIS, Associate Judge:

In June 1975, appellee Keg, Inc., (Keg) entered into a listing contract with appellant Blanken & Blanken Investments, Inc.,

(Blanken) authorizing the sale of Keg for $50,000 or whatever other price its two stockholders would agree to accept.[1] The broker was to receive a commission of ten percent of the selling price if one of its clients purchased the corporation's assets or stock. A Mr. Moaveni responded to Blanken's advertisements for the sale of the corporation and signed an acknowledgment that he was introduced to the business through appellant.

Two weeks later, Mr. Moaveni and the stockholders of Keg entered into a contract for the sale of the company's stock. The buyer specifically agreed to pay $5,000 in cash plus back rent in the amount of $1,375. The buyer also agreed to assume and pay the other debts of Keg, up to a maximum of $25,000.[2]

■ Thereafter, the sellers refused to pay the broker its commission. Blanken brought suit seeking ten percent of the sale price, alleging that the sale price was $30,000. The sellers countered that the sale price was only $5,000. The trial court, sitting without a jury, ruled that the sale price was $6,375 (the $5,000 cash plus $1,375 owed in back rent), thus precluding Blanken from collecting a ten percent commission on the balance of the debt assumption (up to its maximum of $25,000). Concluding that the trial court's interpretation of the "purchase price" was in error, we vacate the judgment and remand the case.

The issue presented by this appeal has not previously been decided by this court, but the case of *Khalaf v. Politis*, D.C.Mun. App., 165 A.2d 782 (1960), provides some guidance.[3] In *Khalaf*, we defined "purchase price" as

a consideration, usually monetary, received in exchange for a property interest conveyed. It signifies the expenditure required of a buyer to bring about an agreed return from a seller. [*Id.*, at 783.]

We implicitly recognized in *Khalaf* that the assumption of a debt may constitute valid consideration.

It is unrealistic to suppose that the sale in this case would have been consummated without the buyer's agreement to assume a significant portion of the corporation's indebtedness. Keg as a corporate entity was the beneficiary of the discharge of its debts. "Its gain was as real and substantial as if the money had been paid it and then paid over by it to its creditors." *United States v. Hendler*, 303 U.S. 564, 566, 58 S.Ct. 655, 656, 82 L.Ed. 1018 (1938). Certainly Keg received a benefit of more than $6,375, and it would be unjust to deprive the broker of its agreed-upon percentage of that benefit. The debt assumption, therefore, must be included in the calculation of the sale price. *See Khalaf v. Politis, supra*, at 783. *Cf. Commercial National Bank of Washington v. McCandlish*, 57 App.D.C. 378, 380, 23 F.2d 986, 988 (1928) (assumption of debts treated as valid consideration for the transfer of promissory notes). We recognize, however, that the benefits received by the sellers through the debt assumption may not have reached $25,000. Assuming that to be the case, the broker would be entitled to its ten percent commission only to the extent of the benefit actually conveyed.

---

1. The agreement was as follows:
   Dear Mr. Blanken,
   I hereby authorize you to sell my corp. known as Keg, Inc., t/a The Keg, 2005 Wisconsin Ave. N.W. Wash. D.C. for the price of Fifty Thousand or whatever price I/we agree to accept. If you are successful the corp. will pay your firm a 10% commission of the selling price if you client is the purchaser of the assets or corporation.
      Sincerely,
      KEG, INC.
      By R. Sanders, Jr., Officer
   Mr. Sanders was the vice-president of Keg, and was authorized by its two stockholders, Joseph H. Rinaldi and Thomas Taro, to list the property for sale with Blanken.

2. The circumstances of this sale of a corporation's stock indicate that while the selling stockholders may not have been personally liable for the corporate debts assumed by the purchaser (although this appears to be a matter in dispute), the intent of the parties, as demonstrated by the listing authorization, was that the broker's commission would be calculated on the basis of the total consideration of whatever type passing from the buyer, rather than on the specific cash benefits received by the selling stockholders.

3. We have been unable to find a case precisely on point in any other jurisdiction.

The sale was consummated without an audit of Keg's books, and the sellers assert that the debts were represented to be approximately $9,000. The trial court found that the actual indebtedness was $12,175 (including the $1,375 back rent). Our review of the record leads us to conclude that such a finding is clearly erroneous.[4] The record reflects that the trial court apparently did not take into account the existence of approximately $11,300 worth of then-contested debts. Whether those debts constituted personal obligations of the selling stockholders or obligations of the corporation was an issue which should have been resolved by the trial court.[5] Our own calculations, based on those debts which were identified by Keg as corporate debts, indicate that the trial court's findings did not adequately measure the benefit conveyed to Keg.[6] Accordingly, we vacate the judgment and remand the case for further proceedings and findings consistent with this opinion.[7]

*Vacated and remanded.*

4. The findings of the trial court sitting without a jury will not be disturbed unless they are clearly erroneous. *Cunningham v. Cunningham*, D.C.Mun.App., 154 A.2d 124, 125 (1959).

5. Several of those debts were being litigated in other proceedings when the trial court heard the instant case. If such litigation has been resolved in the meantime, the trial court's task on remand will have been considerably simplified.

6. Our review of the record reveals the following:

Based on the apparently uncontested figures, appellant would be entitled to a ten percent commission on $18,069.96 (including the $5,000 downpayment). It may be entitled to a commission on a higher amount, depending on the resolution of the litigation concerning those debts which are contested. We leave a determination of the exact amount to the trial court, which may find it necessary to conduct further evidentiary proceedings. Should any of our interpretations of the facts be in error, we trust the trial court will discern it and make the necessary adjustments on remand.

7. We recognize the difficulties presented when a broker's commission is based in part on contested liabilities which may remain unresolved for years. Under the circumstances of this case, we are satisfied that the parties will be able to determine with sufficient certainty the exact total amount of the liabilities assumed. We express no opinion as to how a similar problem should best be resolved in any future case in which the parties are not readily able to ascertain the amount of liabilities assumed.